

Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★ ★

# DISSENTING OPINION

Nos. 04-08-00614-CR & 04-08-00615-CR

The **STATE** of Texas,
Appellant

v.

Amanda Marie **HOFFMAN**,
Appellee

From the 216th Judicial District Court, Kerr County, Texas
Trial Court Nos. A-08-161 & A-08-162
Honorable Stephen B. Ables, Judge Presiding

Opinion by: Marialyn Barnard, Justice
Dissenting opinion by: Steven C. Hilbig, Justice

Sitting:       Rebecca Simmons, Justice
               Steven C. Hilbig, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   May 13, 2009

Because the majority fails to properly assess all the facts known to the police at the time of

the search, and thereby concludes the police lacked probable cause, I respectfully dissent.

## BACKGROUND

Amanda Marie Hoffman was charged with possessing a controlled substance and tampering

with physical evidence. She filed a motion to suppress. At the suppression hearing, the State

established that on Saturday, January 26, 2008, Investigator Eric Geske of the Kerr County Sheriff's

Office received information from a confidential informant that Adam Triana was selling crack cocaine from an unspecified motel room in the rear area of Whitten Motel ("the Whitten") in Kerrville, Texas.[1]  The informant, who had always provided reliable narcotics information in the past, told Investigator Geske he received this information from another person.  Geske testified the informant had been providing information on an ongoing basis about Triana's involvement with narcotics.  Triana was well known to police as a trafficker in narcotics, including crack cocaine.  He had numerous arrests for narcotics violations and had previously served prison time for possession of a controlled substance.  Geske testified he had executed a search warrant at Triana's residence, finding crack cocaine and marijuana, a few months before January 26, 2008.[2]  Investigator Geske also had information that Triana would trade drugs for guns.

Investigator Geske took no action on the informant's tip until the following Monday, January 28th, when he received a call from Kerrville Police Department Corporal Harold Engstrom Jr.  Corporal Engstrom told Geske Triana had been arrested that morning for driving with an invalid license and possession of marijuana, and that Triana claimed to be living at the Whitten with Hoffman.  Both men knew Hoffman as Triana's girlfriend or common-law wife.  Investigator Geske testified he shared with Corporal Engstrom what the confidential informant had told him two days earlier.  Corporal Engstrom explained that in his experience, it was common for people dealing drugs out of a motel room or their residence to leave a stash of drugs behind if they are out making a delivery.  He testified dealers prefer not to carry all their narcotics with them, and noted Triana did

---

[1]During the hearing, the Whitten Motel was described variously as a hotel or motel.  The doors of the rooms apparently open to an exterior walkway.

[2]The case resulting from that search was pending indictment at the time of trial.

not have any crack cocaine in his possession when he was arrested. The two officers agreed to meet at the Whitten to determine whether Hoffman was there and whether she would allow them to search the room for narcotics.

Approximately one hour after Triana's arrest, Engstrom and Geske met with the manager of the Whitten at the motel. She informed them Hoffman worked at the Whitten and was provided room 242 as part of her compensation. The manager confirmed Triana was staying at the motel, and she escorted the officers to room 242, which was located on the second floor at the rear of the Whitten.

When the group was about twenty yards away from the room, Hoffman walked out of the room and appeared to speak with someone on the ground level. Hoffman had her back to the group, but soon turned around and made eye contact with the manager and the two officers. Corporal Engstrom was wearing his police uniform. He testified Hoffman had "a look of panic" on her face and "bolted back into the room" "as fast as she could," leaving the door open. Both officers moved quickly to the doorway of room 242, with Corporal Engstrom in the lead. Investigator Geske testified he was concerned for his safety because of Hoffman's actions and his knowledge that Triana would trade drugs for guns. Corporal Engstrom testified when he arrived at the front door he saw Hoffman standing over the toilet flushing it. Investigator Geske testified he could not see Hoffman because his view was blocked by Corporal Engstrom, but he heard the toilet flushing as they arrived at the door of the room. Investigator Geske stated neither officer entered the room until after they heard Hoffman flushing the toilet. Both men testified the front door and the door to the bathroom were left wide open. After seeing Hoffman and hearing the flushing, Corporal Engstrom and Investigator Geske entered the room, and Corporal Engstrom pushed Hoffman away from the toilet.

He reached into the toilet and retrieved a baggie. It was later determined the baggie contained crack cocaine.

Corporal Engstrom testified he had participated in the execution of numerous search warrants where drugs were retrieved from toilets. He further testified that after seeing Hoffman standing over the toilet and flushing it, he entered the room because he feared she was destroying evidence. Investigator Geske also testified he thought Hoffman was destroying evidence and stated it was uncommon for a person to see him with a motel manager and then "immediately run into the room and flush the toilet."

The trial court ultimately granted the motion to suppress and signed findings of fact and conclusions of law. The only finding made by the trial court was that "[a]ll witnesses were credible and testified truthfully." The court concluded that "based on the totality of the circumstances, law enforcement lacked sufficient probable cause to enter the motel room" and "an exigency that required an immediate entry into said motel room without a warrant did not exist."

## APPLICABLE LAW

Because the trial court found the only witnesses who testified – Investigator Geske and Corporal Engstrom – to be "credible and truthful," we review the application of the law to the facts *de novo*. *See Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Both probable cause and exigent circumstances must have existed for the search to pass muster under the Fourth Amendment. *See Gutierrez v. State*, 221 S.W.3d 680, 685-86 (Tex. Crim. App. 2007). "Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found." *Estrada v. State*, 154 S.W.3d 604,

609 (Tex. Crim. App. 2005). In reviewing the evidence, we consider the "totality of the circumstances" known to the police at the time of the search. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The circumstances supporting a finding of probable cause may include flight or similar evasive conduct. *See United States v. Macias*, 546 F.2d 58, 61 (5th Cir. 1977) (holding officers had probable cause to search vehicle that made u-turn to avoid checkpoint and appeared to be "loaded down"); *Pyles v. State*, 755 S.W.2d 98, 109 (Tex. Crim. App.) (holding fact that appellant immediately turned and started walking in opposite direction when confronted by police officer was factor to be considered in determining existence of probable cause to believe he was attempting to flee after committing offense), *cert. denied*, 488 U.S. 986 (1988); *see also Illinois v. Wardlow*, 528 U.S. 119, 122, 124-5 (2000) (holding defendant's unprovoked flight from area of heavy narcotic trafficking after noticing uniformed officers provided reasonable suspicion to detain and stating, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"). The circumstances may also include attempts to discard or conceal items. *See United States v. Wadley*, 59 F.3d 510, 512-13 (5th Cir. 1995); *Arnold v. State*, 831 S.W.2d 556, 559 (Tex. App.–Austin 1992, pet. ref'd). Courts also consider the experience of the officers involved because conduct that appears innocent to a causal observer may carry an entirely different message to a trained, experienced police officer. *Segura v. State*, 826 S.W.2d 178, 182 (Tex. App.–Dallas 1992, pet. ref'd).

In determining whether probable cause exists, we are instructed to use a common-sense approach:

> As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267

U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). Moreover, our observation in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

*Texas v. Brown*, 460 U.S. 730, 742 (1983). Therefore, if one probable explanation of a set of circumstances "as understood by those versed in the field of law enforcement" is that a crime is being committed, probable cause exists. *See State v. Cullen*, 227 S.W.3d 278, 285 (Tex. App.–San Antonio 2007, pet. ref'd) (Hilbig, J., concurring) (stating "under the proper standard for determining the existence of probable cause, even though there may be a number of explanations offered to account for an officer's observations, the pertinent question is whether one of those explanations is that the person was committing an offense"). That there may be an innocent explanation for the set of facts does not defeat a finding of probable cause:

> [T]herefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub silentio impose a drastically more rigorous definition of probable cause than the security of our citizens demands . . . In making a determination or probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty" but the degree of suspicion that attaches to the particular types of non-criminal acts."

*Eisenhauer v. State*, 678 S.W.2d 947, 954 (Tex. Crim. App. 1984) (quoting *Gates*, 462 U.S. at 243 n.13), *overruled on other grounds*, *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991).

If probable cause is present, exigent circumstances justifying a warrantless search exist if "the police could reasonably have concluded that evidence would be destroyed or removed before they could obtain a search warrant." *McNairy v. State*, 835 S.W.2d 101, 107 (Tex. Crim. App. 1991). As acknowledged by the majority, the same facts used in the probable cause analysis may be relied upon in determining exigent circumstances. *See Parker v. State*, 206 S.W.3d 593, 601 (Tex. Crim. App. 2006).

## ANALYSIS

In reaching its conclusion that Investigator Geske and Corporal Engstrom did not have probable cause to search, the majority fails to consider all the information known to the officers before they entered Hoffman's room. In reaching its conclusion, the majority cites only the following facts argued by the State: (1) Triana lived at the Whitten; (2) Triana was a known drug dealer or user; and (3) Hoffman was Triana's wife or girlfriend. *Hoffman v. State*, Nos. 04-08-00614-CR & 04-08-00615-CR, Slip Op. at ____ (Tex. App.—San Antonio May ___, 2009). However, the following facts were also known to the police:

- Investigator Geske received information from a confidential informant that Triana was selling crack cocaine from the "rear" of the Whitten two days before officers went there to speak to Hoffman. The informant had been providing Geske information about Triana on an ongoing basis and the information had always been accurate[3];

---

[3]The majority discounts the information from the confidential informant because he received the information from a third party whose reliability was unknown to the investigators. *See Hoffman v. State*, Nos. 04-08-00614-CR & 04-08-00615-CR, Slip Op. at ____ (Tex. App.—San Antonio May ___, 2009). However, even if we consider the information as an anonymous tip, such a tip, when "coupled with observations by police may ultimately present . . . probable cause." *See Turner v. State*, 261 S.W.3d 129, 134 (Tex. App.–San Antonio 2008, no pet.).

- Triana told the officer who arrested him he was living at the Whitten with Hoffman;

- Triana did not have any crack cocaine in his possession when arrested;

- The investigators arrived at the Whitten approximately one hour after Triana was arrested;

- The manager at the Whitten told investigators Hoffman worked at the motel and was provided a room as part of her compensation. The manager confirmed Triana was staying at the motel;

- Hoffman's room was located at the rear of the motel;

- When Hoffman saw the officers she had a "look of panic" upon on her face and "bolted" into her room "as fast as she could" before officers even indicated they were there to speak with her;

- Hoffman did not close the room door or the bathroom door; and

- Corporal Engstrom saw Hoffman standing over the toilet while flushing it.

Further, the trial court heard, and found credible and truthful, the following testimony about the officers' training and experience:

- Drug dealers using a motel room will often not keep their entire stash of drugs on them when making deliveries away from the room, but will use the room as a storage place;

- It is common for people to attempt to dispose of drugs by flushing them when they are aware of the presence of police;

- Corporal Engstrom had participated in the execution of numerous search warrants where drugs were retrieved from toilets; and

- Investigator Geske testified it was "uncommon" for someone to see him and then immediately run into a room and flush the toilet.

Although the majority acknowledges the State's argument that the investigators' training and experience led them to believe Hoffman's conduct was indicative of criminal behavior, it appears the majority did not afford this evidence any weight. *See Segura*, 826 S.W.2d at 182 ("[w]hen determining probable cause, we must take into account the experience of the peace officer.").

The majority concludes the State's argument that there was probable cause to search is "unpersuasive" because the police acknowledged they did not have probable cause when they arrived at the Whitten; police suspicions centered on Triana, who was already in custody; and police had no specific information that Hoffman possessed drugs. *Hoffman v. State*, Nos. 04-08-00614-CR & 04-08-00615-CR, Slip Op. at ____ (Tex. App.—San Antonio May ___, 2009). However, these facts alone do not encompass the "totality of the circumstances" and are not determinative of the issue of probable cause.

Triana may have been the focus of the investigation, but another aspect of the investigation was to determine whether drugs were present in his room at the Whitten. Triana's known history of drug dealing, the informant's tip, the fact Triana did not have crack cocaine on him when he was arrested, and the officers' experience led them to reasonably believe Triana may have left crack cocaine in his motel room. Although none of the information provided by the informant pointed to Hoffman individually, his information coupled with Triana's admission that he lived with Hoffman at the Whitten certainly brought her into the sphere of suspicion. That suspicion grew stronger after the police arrived at the Whitten and the manager confirmed Triana was staying there with Hoffman, and that Hoffman's room was in the rear of the motel. Hoffman's panicked look when she saw the investigators and her immediate flight into the room added weight to the investigators' suspicion there were drugs in the room. *See Wardlow*, 528 U.S. at 124-25. Seconds later, Hoffman was standing over the toilet in the room, flushing it. It is this act of destroying or disposing of some object within seconds of seeing the police that tips the facts in favor of probable cause.

Two cases illustrate this point. In *Wadley*, the court considered whether probable cause existed to search a person police encountered in a housing project known for a "high incidence of

drugs transactions." 59 F.3d at 512. Without having any information linking Wadley to drugs, police approached him on the street and attempted to ask him questions. *Id.* at 511. Wadley ran from the police and during the chase an officer observed Wadley reach into his jacket pocket "as though he wanted to dispose of something hidden in the pocket." *Id.* The Fifth Circuit concluded that Wadley's presence in an area known for drug transactions, coupled with his act of running from the officers, his apparent attempt to dispose of something during the chase, and the officer's testimony that drug suspects will often attempt to dispose of drugs while being chased were sufficient facts to constitute probable cause. *Id.* at 512-13. In *Arnold*, the Austin Court of Appeals considered whether probable cause existed to search a matchbox. 831 S.W.2d at 557. In that case, police encountered the defendant in front of a location known for drug trafficking. *Id.* Arnold appeared startled when he saw the police and hurried into a nightclub. *Id.* Police followed him into the club and saw Arnold attempting to hide a matchbox behind a machine. *Id.* The police testified Arnold had a prior arrest for cocaine and that matchboxes are commonly used to carry drugs. *Id.* While noting Arnold's location, his actions upon seeing the police, and police knowledge of Arnold's association with drugs, the court highlighted his concealment of the matchbox in concluding there was probable cause:

> Most importantly, the officer's suspicions [about drugs in the matchbox] were confirmed when he saw appellant trying to hide or dispose of the matchbox behind the game machine. Under the circumstances, a reasonably prudent and cautious police officer would be justified in believing that appellant would not go to such trouble if the box contained only matches.

*Id.* at 559.

The majority contends *Wadley* and *Arnold* are distinguishable, and therefore inapplicable, because the searches or seizures in those cases occurred in public places rather than a private

residence. *Hoffman v. State*, Nos. 04-08-00614-CR & 04-08-00615-CR, Slip Op. at ____ (Tex. App.—San Antonio May ___, 2009). However, the location of the search or seizure is of no moment in the probable cause determination. Location is important only in determining whether exigent circumstances are required for entry into a particular place without a warrant. *See Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006) (holding that State must prove exigent circumstances justifying immediate need to enter residence without warrant); *Janicek v. State*, 634 S.W.2d 687 (Tex. Crim. App. 1982) (holding that in every warrantless entry into private residence State has burden to demonstrate that exigencies of situation made entry imperative).

## CONCLUSION

In the present case, the facts observed by and known to the investigators as they stood at the door of room 242, together with the knowledge gained from their training and experience, would have "warrant[ed] a man of reasonable caution in the belief" that Hoffman was attempting to destroy evidence or dispose of contraband. *See Brown*, 460 U.S. at 742; *see also Wadley*, 59 F.3d at 512-13; *Arnold*, 831 S.W.2d at 559. It is of no moment that there may be an innocent explanation for Hoffman's conduct. *See Eisenhauer*, 678 S.W.2d at 954; *Cullen*, 227 S.W.3d at 285. Because one probable explanation, based on the totality of the circumstances and viewed or understood in light of the experience of the investigators, was that there was contraband in the room and Hoffman was attempting to dispose of it, the investigators had probable cause to enter the room and search the toilet. Both the trial court and the majority erred by concluding otherwise. The facts that establish probable cause in this case also led the investigators to the reasonable conclusion that evidence would be destroyed before they could obtain a search warrant. Accordingly, there were exigent

circumstances justifying a warrantless search. *See Parker*, 206 S.W.3d at 601; *McNairy*, 835 S.W.2d at 107.

For these reasons, I must disagree with the majority and conclude the trial court abused its discretion in ruling the investigators had no probable cause or exigent circumstances when they entered Hoffman's room. I would uphold the search and reverse the trial court's order granting the motion to suppress.

Steven C. Hilbig, Justice

PUBLISH